*Rec# 533341.*

**55.**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENNIS M. ELLIOTT,

         Petitioner,

Vs.

KENNETH ROMANOWSKI,

         Respondent.

_____/

Civil Action No. **05-74085**

Hon. Judge_____

*NANCY G. EDMUNDS*

*MAGISTRATE JUDGE R. STEVEN WHALEN*

**FILED**

OCT 2 5 2005

CLERK'S OFFICE, DETROIT-PSG
U.S. DISTRICT COURT

PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Dennis M. Elliott, In Pro Se Litigation respectfully states:

1. Petitioner Dennis Elliott is a citizen of the United States, is a resident of Wayne County (currently incarcerated in Lenawee County) Michigan and is currently imprisoned in the city of Adrian, Michigan.

2. Petitioner Dennis Elliott, is currently unconstitutionally detained and imprisoned by the Respondent, Kenneth Romanowski, Warden at Gus Harrison Correctional Facility, where Petitioner Dennis Elliott is serving a mandatory term of life imprisonment, and a consecutive term of (2) years, imposed by Judge Thomas W. Brookover, of the Wayne County Circuit Court (Criminal Division) after a jury found Petitioner Dennis Elliott guilty of (1) count of first degree premeditated murder MCL § 750.316; and (1) count of felony firearm MCL § 750.227b.

3. Petitioner has exhausted all State remedies available to him with regard to his claim that the trial court abused its discretion when it denied Petitioner's motion for a new trial, which ultimately denied Petitioner's

1

due process rights, and equal protection of the law, thereby creating a miscarriage of justice.

a. On October 18, 2002, Petitioner by and through his trial counsel Ronnie M. Strong (P34545) filed a motion for a new trial on the legal basis that the verdict was against the great weight of the evidence. See Motion for new trial. Appendix A .

b. On November 5, 2002, the trial court on the day of sentencing heard and denied Petitioner's motion for a new trial. (St. p.5-6; 13-14)(St. Sentencing transcript). Case No.02-4744 01.

c. On June 30, 2003, Petitioner by and through his Appellate Counsel Mark Hall (P24478), filed his appellate brief in the Michigan Court of Appeals by right. Petitioner claimed that his conviction and sentence necessitated a reversal. The point heading of the first issue presented in his brief on appeal were:

    I.      THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT
            DENIED PETITIONER'S MOTION FOR A NEW TRIAL.

d. On May 18, 2004, the Michigan Court of Appeals affirmed Petitioner's conviction and sentence on his claim of the trial court's abuse of discretion in denying Petitioner's motion for a new trial. The Court of Appeals unreasonably agreed with the trial court that Petitioner was not entitled to a new trial, and for reasons fully explained see Court of Appeals unpublished per curiam opinion. Appendix B . People v Elliott, ____Mich App____ Case No.246773.

e. Within 56 days of the Court of Appeals opinion affirming Petitioner's conviction and sentence, Petitioner, in Propria Persona, filed application for leave to appeal in the Michigan Supreme Court. Petitioner presented issue one to the Michigan Supreme Court which was identical to issue one presented

2

to the Michigan Court of Appeals. On December 29, 2004, the Michigan Supreme denied leave to appeal in standard form, inter alia that they were not persuaded that the questions presented should be reviewed by them. Appendix C . People v Elliott, ____Mich____, Case No.126466.

4. Petitioner has exhausted all State remedies available to him with regard to his claim that the evidence presented at trial was insufficient to convict him of first degree murder, in violation of his fundamental due process rights, guaranteed through the provisions of the United States Constitution. See Jackson v Virginia, 443 US 307 (1979); Mullaney v Wilbur, 421 US 684 (1975); In Re Winship, 397 US 358 (1970).

a. On October 10, 2002, Petitioner was convicted of first degree premeditated murder, and felony firearm. Subsequent to his conviction, on October 18, 2002, Petitioner by and through his trial counsel Ronnie M. Strong filed motions contesting his disagreement with the jury's verdict. See Appendix A .

b. On June 30, 2003, Petitioner by and through his Appellate Counsel Mark Hall, filed his appellate brief in the Michigan Court of Appeals by right. Petitioner claimed that his conviction and sentence should be reversed due to the prosecutor's failure to establish all the necessary elements in order to sustain a conviction on first degree premeditated murder. The point heading of the second issue presented in his brief on appeal were:

II.    THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT
       TO CONVICT THE PETITIONER OF FIRST   DEGREE
       MURDER.

c. On May 18, 2004, the Michigan Court of Appeals affirmed Petitioner's conviction and sentence on his claim of the evidence being insufficient to convict him of first degree premeditated murder. The Court of Appeals adjudication of this claim resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. See Court of Appeals unpublished per curiam opinion. Appendix B . People v Elliott, ____Mich App____, Case No.246773.

d. Within 56 days of the Court of Appeals opinion affirming Petitioner's conviction and sentence, Petitioner, in Propria Persona, filed application for leave to appeal in the Michigan Supreme Court. Petitioner presented issue two to the Michigan Supreme Court which was identical to issue two presented to the Michigan Court of Appeals. On December 29, 2004, the Michigan Supreme Court denied leave to appeal in standard form, inter alia that they were not persuaded that the questions presented should be reviewed by them. Appendix C . People v Elliott, ____Mich____, Case No.126466

5. Petitioner has exhausted all State remedies available to him with regard to his prosecutorial misconduct claim in violation of the Fourteenth Amendment Due Process clause of the United States Constitution.

a. During the course of trial, Petitioner's trial counsel Ronnie M. Strong failed to object to the prosecutor's misconduct, thereby failing to preserve the issue for appellate review. However, failure to object to misconduct of the prosecution does not preclude appellate review, if the failure to consider the issue would result in a miscarriage of justice. Wainwright v Sykes, 433 US 72 (1977).

b. On June 30, 2003, Petitioner by and through his Appellate Counsel Mark Hall, filed his appellate brief by right in the Michigan Court of Appeals. Petitioner claimed that his conviction and sentence should be reversed due to the prosecutor's misconduct, which ultimately denied

4

Petitioner his due process rights to a fair trial. The point heading of the third issue presented in his appellate brief were:

III.   THE PROSECUTION'S CLOSING ARGUMENTS IMPROPERLY SHIFTED
       THE BURDEN OF PROOF, ATTACKED TRIAL COUNSEL,  AND  SET
       FORTH A PERSONAL BELIEF IN GUILT, THEREBY DENYING  THE
       PETITIONER A FAIR TRIAL.

c. On May 18, 2004, the Michigan Court of Appeals affirmed Petitioner's conviction and sentence on his claim of prosecutorial misconduct. The Court of Appeals adjudication on this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. The United States Supreme Court has held that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." Berger v United States, 295 US 78, 88 (1935). For reasons fully explained see Court of Appeals unpublished per curiam opinion. Appendix B . People v Elliott, ____Mich App____, Case No.246773.

d. Within 56 days of the Court of Appeals opinion affirming Petitioner's conviction and sentence, Petitioner, in Propria Persona, filed application for leave to appeal in the Michigan Supreme Court. Petitioner presented issue three to the Michigan Supreme Court which was identical to issue three presented to the Michigan Court of Appeals. On December 29, 2004, the Michigan Supreme Court denied leave to appeal in standard form, inter alia that they were not persuaded that the questions presented should be reviewed by them. Appendix C . People v Elliott, ____Mich____, Case No.126466.

As set forth in the accompanying Memorandum of Law, Dennis M. Elliott is being detained in violation of his Sixth, Eighth, and Fourteenth Amendment Rights to the United States Constitution.

7. Dennis M. Elliott, has not filed any previous Petition for Writ of

5

Habeas Corpus in this or any other Federal District Court.

## RELIEF REQUESTED

For these reasons, petitioner Dennis M. Elliott, asks:

A. That Respondent be required to appear and answer the allegations of this petition;

B. That after full consideration, this Court grant this Petition and Order that Petitioner Dennis Elliott, either be promptly retried or released from custody;

C. That this Court grant such other, further, and different relief as the Court may deem just and proper under the circumstances, and

D. That this Court Appoint Counsel for Petitioner, and

E. That this Court grant oral argument in this matter.


Respectfully submitted,


By: *Dennis M Elliott*

Dennis M. Elliott
Pro Se Petitioner
No. 148343
Gus Harrison Correctional Facility
2727 E. Beecher Street
Adrian, Michigan 49221

Dated: 10-20-_____, 200 5

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DENNIS M. ELLIOTT,

        Petitioner,

Vs.

KENNETH ROMANOWSKI,

        Respondent.

_____/

MIKE COX
Attorney General
Attorney for Respondent

Dennis M. Elliott
Petitioner in Pro Se

_____

05-74085

Civil Action No._____

Hon. Judge_____

NANCY G. EDMUNDS

MAGISTRATE JUDGE R. STEVEN WHALEN

**MEMORANDUM OF LAW IN SUPPORT OF**
**PETITION FOR WRIT OF HABEAS CORPUS**

# FILED

OCT 2 5 2005

CLERK'S OFFICE, DETROIT-PSG
U.S. DISTRICT COURT

By: Dennis M. Elliott
    MDOC#148343
    Petitioner in Pro Se
    Gus Harrison Correctional Facility
    2727 E. Beecher Street
    Adrian, Michigan 49221

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................... i

STATEMENT OF QUESTIONS PRESENTED ...................................... v

STATEMENT OF FACTS ...................................................... 1

ARGUMENT:

    I.        THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT
             DENIED THE PETITIONER'S MOTION FOR A NEW TRIAL......... 9

    II.      THE EVIDENCE PRESENTED AT TRIAL WAS
             INSUFFICIENT TO CONVICT THE PETITIONER
             OF FIRST DEGREE MURDER............................... 17

    III.    THE PROSECUTION'S CLOSING ARGUMENTS IMPROPERLY
             SHIFTED THE BURDEN OF PROOF, ATTACKED TRIAL
             COUNSEL, AND SET FORTH A PERSONAL BELIEF IN
             GUILT, THEREBY DENYING PETITIONER A FAIR TRIAL....... 27

RELIEF REQUESTED ........................................... 42

APPENDICES ...............................(Seperately attached).

TABLE OF AUTHORITIES

CASES

Alston v United States, 552 A2d 526 (DC App, 1989) .................. 33

Anderson v Contario, 303 Mich 75 (1942) ........................... 13

Austin v United States, 382 F2d 129; 127 US App DC 180 (1967) ....... 25

Berger v United States, 295 US 78 (1935) ........................... 27

Donnelly v DeChristoforo, 416 US 637 (1974) ........................ 27

Francis v Franklin, 471 US 307 (1985) .............................. 34

In Re Winship, 397 US 358 (1970) ........................... 17,18,32,34

Iv den, 388 Mich 793 (1972) ........................................ 23

Iv den, 394 Mich 788 (1975) ........................................ 23

Iv den, 397 Mich 861 (1976) ........................................ 23

Iv den, 408 Mich 857 (1980) ........................................ 23

Iv den, 425 Mich 867 (1986) ........................................ 40

Jackson v Virginia, 443 US 307 (1979) ........................... 17,18

People v Allen, 201 Mich App 98 (1993) ............................. 41

People v Bairefoot, 117 Mich App 225 (1982) ..................... 28,37

People v Berthiaume, 59 Mich App 451 (1975) ........................ 23

People v Boske, 221 Mich App 129 (1922) ............................ 38

People v Brocato, 17 Mich App 304 (1969) ........................... 28

People v Clay, 91 Mich 716 (1970) .................................. 23

People v Daoust, 228 Mich App 1 (1998) ............................. 11

People v Farrar, 36 Mich App 294 (1972) ........................ 28,39

People v Federico, 146 Mich App 776 (1985) ..................... 39,40

People v Fields, 64 Mich App 166 (1975) ................... 23,32,33,34,35

People v Fisher, 193 Mich App 284 (1992) ........................... 19

People v Folkes, 71 Mich App 95 (1976) ............................. 20

CASES

People v Foster, 175 Mich App 311 (1989) ..................... 27,28,35,36

People v Fuqua, 146 Mich App 250 (1986) ............................. 39

People v Gadson, 348 Mich 307 (1957) ................................ 18

People v Garcia, 398 Mich 250 (1979) ................................ 40

People v Gill, 43 Mich App 598 (1973) ............................... 21

People v Griffin, 108 Mich App 625 (1981) ........................... 23

People v Guenther, 188 Mich App 174 (1991) .......................... 36

People v Hampton, 407 Mich 354 (1979) ............................... 18

People v Herbert, 444 Mich 466 (1993) ............................... 12

People v Hoffmeister, 394 Mich 155 (1975) ......................... 22,23

People v Horn, 41 Mich App 755 (1972) ............................... 23

People v Humphreys, 24 Mich App 411 (1970) .......................... 38

People v Jesse Smith, 81 Mich App 190 (1978) ........................ 23

People v Johnson, 427 Mich 98 (1986) ................................ 25

People v Kent, 157 Mich App 780 (1987) .............................. 37

People v Lemmon, 456 Mich 625 (1998) ................... 10,11,12,13,14,15

People v Livingston, 63 Mich App 129 (1975) ......................... 23

People v McCray, 245 Mich App 631 (2001) ........................... 14,15

People v Moncure, 94 Mich App 252 (1979) ............................ 23

People v Montevecchio, 32 Mich App 163 (1971) ....................... 38

People v Moore, 189 Mich App 315 (1991) ............................. 39

People v Morrin, 31 Mich App 301 (1971) ............................. 21

People v Petrella, 424 Mich 221 (1985) ............................ 19,25

People v Rosales, 160 Mich App 304 (1987) ........................ 28,34,35

People v Shannon, 88 Mich App 138 (1979) ............................ 32

People v Smith, 158 Mich App 220 (1987) ............................. 38

CASES

People v Sowders, 164 Mich App 36 (1987) ...........................   21

People v Stanaway, 446 Mich 643 (1994) .............................   28

People v Stiller, 242 Mich App 38 (2000) ..........................   10

People v Tommolino, 187 Mich App 14 (1991) .........................   40

People v Truong (aft rem), 218 Mich App 325 (1996) ................   41

People v Vertin, 56 Mich App 669 (1974) ............................   23

People v Vinunzo, 212 Mich 472 (1920) ..............................   25

People v Wise, 134 Mich App 82 (1984) ..............................   37

People v Wolfe, 440 Mich 508 (1992) ..............................   18,25

Pharr v United States, 48 F2d 767 (CA 6, 1931) .....................   27

Sandstorm v Montana, 442 US 510 (1979) .............................   34

State v LaDabouche, 146 Vt 279 (1983) ..............................   13

State v Kringstad, 353 NW2d 302 (ND, 1984) .........................   13

State v Martin, 20 Ohio App 3d 172 (1983) ..........................   13

Strickland v Washington, 466 US 668 (1984) .........................   40

Ulster Co Court v Allen, 442 US 104 (1979) .........................   34

United States v Ashworth, 836 F2d 260 (CA 6, 1988) ................   9

U.S. v Bowker, 372 F3d 365 (CA 6, 2004) ............................   9

U.S. v Colon-Munoz, 318 F3d 348 (CA 1, 2003) .......................   9

United States ex rel Victor v Yeager, 330 F Supp 802 (D.N.J. 1971) ...   9

United States v Garcia, 978 F2d 746 (CA 1, 1992) ..................   14

United States v Kuzniar, 881 F2d 466 (CA 7, 1989) ................   14

United States v Martin, 696 F2d 49 (CA 6, 1983) ...................   34

United States v 763 F2d 1297 (CA 11, 1985) ........................   14

United States v Sanchez, 969 F2d 1409 (CA 2, 1992) ................   14

U.S. v Washington, 184 F3d 653 (CA 7, 1999) .......................   11

## CASES

United States v Young, 470 US 1 (1985) .............................  27

Wainwright v Sykes, 433 US 72 (1977) .............................  27

## STATUE, COURT RULES, AND MISCELLANEOUS AUTHORITY

Federal Rules of Criminal Procedure (33) ...........................  9

28 U.S.C. § 2254 ......................................... 16,17,18,26,41

U.S. Const Am XIV ....................................... 18,27,28,31,34

## STATEMENT OF QUESTIONS PRESENTED

I.     THE TRIAL COURT ABUSED ITS DISCRETION  WHEN IT
       DENIED THE PETITIONER'S MOTION FOR A NEW TRIAL

              Trial Court answers "No"
              Court of Appeals answers "No"
              Michigan Supreme Court answers "No"
              Petitioner answers "Yes"

II.    THE EVIDENCE  PRESENTED  AT  TRIAL  WAS
       INSUFFICIENT TO CONVICT  THE PETITIONER
       OF FIRST DEGREE MURDER

              Trial Court answers "No"
              Court of Appeals answers "No"
              Michigan Supreme Court answers "No"
              Petitioner answers "Yes"

III.   THE PROSECUTION'S CLOSING ARGUMENTS IMPROPERLY
       SHIFTED  THE BURDEN  OF PROOF, ATTACKED  TRIAL
       COUNSEL,  AND SET FORTH A PERSONAL  BELIEF  IN
       GUILT, THEREBY DENYING PETITIONER A FAIR TRIAL

              Trial Court answers "No"
              Court of Appeals answers "No"
              Michigan Supreme Court answers "No"
              Petitioner answers "Yes"

## STATEMENT OF FACTS

### Procedural History

On March 21, 2002, Petitioner Elliott, was arraigned upon the complaint and warrant before the Honorable Thomas J. Shannon, Magistrate of the 36th District Court. Petitioner was arraigned on the following charges: Count (1) First degree premeditated murder MCL § 750.316; and Count (2) Felony firearm MCL § 750.227b.

On March 27, 2002, Before the Honorable John R. Perry, 36th District Court Judge, Petitioner's Preliminary Examination was adjourned. In addition, there was a waiver of the twelve (12) day rule.

On April 8, 2002, Petitioner's Preliminary Examination was conducted before the Honorable Nancy Farmer, 36th District Court Judge, and resulted in a "bind-over" as charged.

On April 15, 2002, Petitioner was arraigned upon the Information before the Honorable Mary M. Waterstone, Wayne County Circuit Court Judge. A calendar conference was also conducted, and resulted in the Preliminary Examination transcript being ordered and the matter being continued to a Final Conference.

On May 17, 2002, the Final Conference was conducted in part and thereafter continued. Moreover, after several additional adjournments, on May 29, 2002, the matter was transferred to the docket of the Honorable Timothy M. Kenny, Chief Circuit Court Judge. On May 31, 2002, Judge Kenny transferred the case, for trial, to the docket of the Honorable Thomas W. Brookover, Visiting Judge.

On June 28, 2002, Judge Waterstone granted Trial Counsels Motion to Withdraw. On August 2, 2002, present counsel was appointed, and a Pre-trial conference conducted.

On September 13, 2002, Petitioner's Motions to "Dismiss the Case and

1

Quash the Information" were argued before the Honorable Craig S. Strong, Circuit Court Judge, and denied.

Furthermore, on September 13, 2002, a Pre-trial was conducted before Judge Brookover, and resulted in the matter being set for Trial on October 7, 2002.

On October 3, 2002, Judge Brookover resolved several Prosecution Witness problems.

On October 7, 2002, the Petitioner's jury trial commenced before Judge Brookover with jury selection. Moreover, on October 10, 2002, said trial ended with the following jury verdicts: Count (1) Guilty of first degree murder; Count (2) Guilty of felony firearm. Trial Transcript, Vol IV p.3. (Trial Transcript hereinafter referred to as TT).

OVERVIEW OF MATERIAL FACTS

It was charged that Petitioner on August 17, 1986, killed Howard Smith. It was alleged that Petitioner was armed with a weapon.

The Prosecution's case was presented through Witnesses whose testimony is summarized as follows:

Aaron Heard          TT Vol II p.157-220

1. Age 19 or 20 at time of incident. Knew Eric Harris, Terrell Fuqua-grew up on Cherrylawn. Knows Petitioner, he lived down the street. I was staying next door to Eric Smith. On 8/16/86 went to show with Harris and Fuqua, returning about 10:00 or 11:00 P.M. Me, Harris and Fuqua were standing in-front of my house talking for about 30 minutes to an hour. The victim (Howard Smith) was standing on Eric Smith's porch. The Petitioner pulled up in a Brown Ford Tempo, exited the car, approached us, and started talking to us.

2. The victim wanted us to leave, and Petitioner told him to mind his

2

own business. The victim and Petitioner started arguing. The victim came part way down the stairs and Petitioner walked towards him and again told him to mind his business. They continued to argue for 5 to 10 minutes. Petitioner pulled a weapon from his back and shot the victim while he was still on the steps. The victim was moving towards the house when I heard a second shot. I started running after hearing the second shot. I think Petitioner got back in the car and left. There was another man in the car, but I did not see his face. I think the Petitioner was kind of dressed-up-think he had on a tie and dress pants. I came back after the shooting, and the victim was still on the porch. Eric Smith returned home, and I told him what had happened.

3. I made three Statements to the Police. First statement on 8/17/86, in which I LIED because I was scared and being threatened by Petitioner. Second statement was 8/28/86, in which I stated Petitioner shot him. Third statement was on 8/29/86, in which I stated I did not see who fired the shots.

4. That I received a phone-call from Petitioner prior to my statements, and he told me don't say anything. That during my second statement I told the police I had been threatened. That I received only one phone-call from Petitioner before my first statement, changed to before his second statement. I named Petitioner in the second statement because I wanted to get him off the street, and I thought I was doing the police a favor. I also felt pressured and intimidated by the police. I have had contact with Petitioner after the case was dismissed.

Nadine Hicks               TT Vol III p.5-20

1. In 1986 lived on Cherrylawn. Does not recall date of incident, made statement to police, told truth in statement. On her porch when heard gun shots at night, and recalls seeing a car afterwards. her statement was read

to jury: saw brown or burgundy car stopped in middle of street; heard 3 shots; the car drove off coming towards her; and she saw Eric or Junior about 10 minutes later and they walked up to where it happened. At the time of the shots, Aaron Heard was on Sandy's (my neighbors) porch - about 6 or 7 houses from the scene.

<u>Sandra Johnson</u>                TT Vol III p.21-34

1. Lived on Cherrylawn. Was on porch when heard 3 shots. Ran inside but saw a car go down the street - driver and person ducked down in back seat. Made statement (8/28/86), reviewed it, does not recall it. Portion of statement read to jury: saw brown tempo stop; as soon as it stopped heard 3 shots; Aaron Heard was sitting on our porch when shots fired (been there since about 11:30); and he and Eric went down to the scene.

<u>Michael Smith</u>                TT Vol III p.35-37

1. Brother of victim, identified him at the Morgue. Exhibit One (1), photograph of victim.

<u>Ray Murphy</u>                TT Vol III p.39-78

1. Knows Petitioner through his sister. August 16th, went to Petitioner's Sister's wedding reception - the Petitioner was there. he left the reception with the Petitioner about 1:00 A.M. Driving his Mother's car, a brown Ford either a Tempo or Escort. Stopped on Cherrylawn where Petitioner got out for about 3 to 5 minutes. Did not hear any shots, fooling with radio which was up loud. Petitioner returned to car, did not enter, and I drove away. Later learned something had happened, and returned from North Carolina to make a statement - counsel present when made statement. Not sure where reception held at. Not sure what time he arrived. Left with Petitioner about 1:00 A.M. when reception was breaking up (people starting to leave). Petitioner seemed normal when he returned to the car.

4

Officer D. Parshall            TT Vol III p.79-101

     1. He had contact with Petitioner on 10/15/86 - interviewed him. Petitioner statement read to jury (p.89-91); did not know the victim seriously; at Sister's wedding reception; arrived around midnight; went to an after-party at Pams (Sisiter) house; left Pam's after 1:00 A.M.; Ray Murphy gave me a ride to my house (13593 Cherrylawn); briefly spoke with Terrell just before going into house; and Murphy driving a brown four-door Tempo.

     The Petitioner did not sign the "rights form." No knowledge if "reception information" was checked out by Homicide.

Eric Harris                TT Vol III p.102-131

     1. Age 16 in 1986, lived on Cherrylawn, and past 14 years in Navy. Did not know Petitioner in 1986, but does now (has seen him in the neighborhood). Knows Mr. Fuqua and Mr. heard - night of the shooting they went to the show. He was inside when he heard 3 shots. He looked out and saw a car go past. The police told him what to say, they threatened to lock him up.

Terrell Fuqua             TT Vol III p.131-146

     1. Knows petitioner, he went to school with my mother. Lived on Cherrylawn with Mr. Heard. No recall of doing anything with Mr. Harris or Mr. heard the night of the shooting. No recall of talking to anyone on 8/17/86. Shown statement, did not recognize it. No recall of talking with police. Did not know the victim. Never identified the shooter - has no information about the incident.

Officer C. Sanders         TT Vol III p.147-159

     1. Worked Homicide in 1986, now retired. Was O.I.C. Took statements from Mr. Fuqua at crime scene. Exhibit 13, photos of Mr. Fuqua, Mr. Harris, and Mr. heard. No recall of checking out wedding reception.

Kenneth Bradley           TT Vol III p.160-166

1. Age 16 or 17 at time of incident. Did not live on Cherrylawn. Knows Mr. Fuqua. No recall of talking to police about shooting. heard rumors regarding the victim's death. Not sure if spoke with Mr. Fuqua about the shooting - memory refreshed, spoke with several people about it.

Eric Smith                    TT Vol III p.167-181

1. Brother of victim. Lived on Cherrylawn. Victim was visiting, did not live with us. He was at his Brother Michael's house, and when he returned, he found victim laying on porch with a few people standing around him. He talked with the victim who said "they got me", and took him to the hospital. He knew Mr. heard, but does not recall where he lived. He spoke with a few people including Mr. Heard and Mr. Fuqua who were present when he arrived.

2. He saw and spoke with Petitioner in 2001/2002. The Petitioner did not say he shot my brother, all he said was "I didn't know that was your brother", and gave me a hug.

Officer P. Kulesa             TT Vol III p.182-189

1. Evidence Technician, dispatched to crime scene. took photos and recovered a spent bullet from the front door.

Doctor S. Kanluen            TT Vol IV p.3-7

1. Has examined the records regarding file 86-6603, Howard Smith. Cause of death was two (2) gunshot wounds to lower left back and lower left leg. Manner of death was homicide.

Trial Counsel Ronnie M. Strong, moved for a motion for directed verdict. (TT. Vol IV p.8). Prosecutor Patterson stated on the record that Aaron Heard gave credible testimony. (TT Vol IV p.9). Trial Court denied motion for a directed verdict. (TT. Vol IV p.10).

The Defense presented witnesses, whose testimony is summarized as follows:

6

<u>Yolanda Elliott</u>                    TT Vol IV p.11-17

1. Petitioner's Sister. married on July 1, 1986, and had Reception on August 16, 1986. Reception at Ferndale Community Hall, Nine Mile and Woodward. Reception started at 4:00 P.M., ended at 1:00 A.M., on August 17, 1986. Petitioner did not arrive until about 10:00 P.M. Saw him at 1:00 A.M., when he was helping clean up. Not sure of the times, but Petitioner did help clean up.

<u>Darwin Elliott</u>                    TT Vol IV p.17-21

1. Petitioner's brother. Recalls attending the wedding reception, but not where it was held. Petitioner was at the reception. He was there till 12:30 A.M. to 1:00 A.M. The reception ended at 1:00 A.M., and Petitioner helped with the clean up. On cross, he testified that Petitioner left between 12:30 A.M. and 1:00 A.M. The drive from the hall to Cherrylawn is about 15 to 20 minutes.

<u>CLOSING ARGUMENTS BY THE PROSECUTION</u>

Prosecutor Patterson tells the jury that they should believe Mr. Heard's testimony, and that Mr. Heard has no reason to lie. (TT. Vol IV p.28). Defense Counsel objected to the Prosecutor's vouching for the credibility of the witness. (TT. Vol IV p.28-29).

The prosecutor continues to vouch for the credibility of witness Heard by stating he has nothing to gain from lying to you. (TT. Vol IV p.29). Prosecutor Patterson furthered his vouching for Witness Heard when he stated: You know he's telling the truth. (TT. Vol IV p.34). Again Prosecutor suggest that Heard's testimony was the truth. (TT. Vol IV p.40); (TT. Vol IV p.45).

Prosecutor Patterson, argues that the alleged statement by Petitioner to Eric Smith, was an apology by Petitioner for allegedly killing Eric Smith's brother Howard Smith. It was alleged that Petitioner said "sorry I didn't

know that was your brother." (TT. Vol IV p.61-62).

SENTENCING

On November 5, 2002, Petitioner appeared for sentencing. Prior to sentencing, Petitioner's motion for a new trial was argued and denied by the trial court. (ST. p.4-7). (Sentencing Transcript hereinafter referred to as ST). Next, several Pre-sentence report discrepancies were resolved by the trial court. (ST. p.14-17). This was followed by statements of respective counsel, Petitioner's opportunity for allocution, and a statement by relatives of the deceased - the Court imposed the following sentences: Mandatory life for premeditated murder; Mandatory two (2) years for the felony firearm conviction. (ST. p.19).

The trial court advised Petitioner regarding his appellate rights, and credited him with three hundred fifty (350) days served prior to sentencing. (ST. p.19).

On June 30, 2003, Petitioner by, and through his appellate counsel Mark Hall, filed a brief on appeal by right in the Michigan Court of Appeals. On May 18, 2004, the Court of Appeals affirmed Petitioner's conviction and sentence.

Within fifty-six (56) days of the Court of Appeals opinion affirming Petitioner's conviction and sentence, he filed for leave to appeal in the Michigan Supreme Court, in Propria Persona. On December 29, 2004, the Michigan Supreme Court denied leave to appeal.

8

Argument

    I               THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT
                       DENIED THE PETITIONER'S MOTION FOR NEW TRIAL.

Summary of Argument

    Appellate Courts give trial courts broad discretion to decide whether
to hold an evidentiary hearing and will reverse a ruling on a motion for
new trial only for abuse of discretion. U.S. v Bowker, 372 F3d 365, 390 (CA
6, 2004). Moreover, Federal Courts review Lower Court's denial of a motion
for a new trial for a manifest abuse of discretion. See U.S. v Colon-Munoz,
318 F3d 348, 357-58 (CA 1, 2003).

    The denial of a defendant's motion for a new trial under Federal Rule
of Criminal Procedure 33, is reviewed for abuse of discretion. United States
v Ashworth, 836 F2d 260, 266 (CA 6, 1988). The court is "limited to examining
the evidence produced at trial to determine whether the district (lower)
court's determination that the evidence does not 'preponderate heavily against
the verdict' is a clear and manifest abuse of discretion". Id. (citation
omitted) Bowker, supra, 372 F3d 365, 390 (CA 6, 2004). However, the test
for habeas relief is not whether the verdict was against the great weight
of the evidence, but whether there was any evidence to support it. United
States ex. rel. Victor v Yeager, 330 F Supp 802, 806 (D.N.J. 1971).

Facts and Argument

    On or about October 18, 2002, Petitioner by and through trial counsel
filed a motion for a new trial. Said motion was heard and denied by the trial
court on the day Petitioner was sentenced (11/05/02). As part of said motion,
Petitioner argued there was no legal basis upon which the jury could believed
the prosecution's only alleged eye witness (Aaron Heard). (ST. p.5-6; 13-
14). In denying the motion, the trial court made mention of the incredible

testimony of many witnesses and the stunning lack of recall:

> "All right. Many of the witnesses in the courts mind, and the
> courts mind, and the jury apparently agreed, in this
> trial gave absolutely incredible testimony. In fact, there
> was evidence of a stunning concentration of amnesia on the
> residents of Cherrylawn and the neighborhood.
>
> The issue for the jury was what witnesses it believed. The
> jury made its decision. The legal review for this court is
> whether the verdict was against the great weight of the
> evidence. It was not, and the motion is denied". (ST. p.14).

Petitioner submits that in denying his motion for new trial, the trial
court manifestly abused its discretion - and now asks this Honorable Court
(Michigan Court of Appeals) to so hold. However, the Michigan Court of Appeals
denied Petitioner relief on this claim pursuant to People v Lemmon, 456 Mich
625, 643; 576 NW2d 129 (1998). See opinion at Appendix B .

As stated, Mr. Heard was the only witness that inculpated the Petitioner
- and his basic testimony is briefly summarized as follows:

> That after going to the movies, he, Eric Harris and Terrell
> Fuqua were talking in front of his house. The Appellant
> arrived as a passenger in a brown car and joined them. The
> victim was standing next-door on Eric Smiths porch, and
> wanted us to leave. The Appellant told him to mind his own
> business. That an argument ensued between the victim and
> Appellant. That during the argument, the Appellant produced
> a gun, shot the victim, and left in the brown car. (TT Vol
> II p.157-220). (See statement of facts).

However, based upon the sever impeachment by prior inconsistent
statements, the fact that several witnesses contradicted his presence at
the scene, and that his testimony was further contradicted by witness Eric
Harris - Petitioner submits that Mr. Heard's testimony was beyond belief
to the extent that it comes within the standard established in People v
Lemmon, 456 Mich 625 (1998):

> "Thus, "a new trial based upon the weight of the evidence
> should be granted only where the evidence proponderates

heavily against the verdict and a serious miscarriage
of justice would otherwise result." LaDabouche, supra
at 285." Lemmon, supra at 642. (Emphasis added).


Therefore, the nature and quality of Mr. Heard's testimony was a proper
and compelling reason for the granting of the motion for a new trial, and
renders the trial, and appellate courts denial a manifest abuse of discretion
as defined in People v Stiller, 242 Mich App 38; 617 NW2d 697 (2000). See
too, U.S. v Washington, 184 F3d 653, 658-59 (CA 7, 1999). In Stiller, the
court held:

> "An abuse of discretion will be found only where the trial
> court's denial of the motion was manifestly  against  the
> clear weight of the evidence. People v Daoust,   228   Mich
> App 1, 16 (1998). Stiller, at 49.

The  specific  problems  with  Mr.  Heard's  testimony  are  set  forth  as
follows:

### STATEMENTS TO THE POLICE:

1. Mr. Heard made three (3) different statements on August 17, 1986;
   August 28, 1986; and August 29, 1986.

2. August 17, 1986, statement: did not identify the Petitioner as the
   shooter, and he admitted lying to police. TT Vol II p.172-173, 193.

3. August 28, 1986, Statement: identified Petitioner as the shooter.
   TT Vol II p.174-176.

4. August 29, 1986, Statement: recanted his August 28th statement,
   and stated he lied because he wanted to get petitioner off the
   street and he thought he was doing the police a favor. TT Vol II
   p.177, 207-208.

5. That Mr. Heard also testified that he lied to the police based
   upon an alleged telephone threat telling him not to say anything
   and to act like he did not see anything; that he received only
   one (1) call from the Petitioner, but could not recall if it was
   prior to his first statement or before or after his second statement
   and that he was not threatened with physical harm. He also
   testified that he has had a lot of contact with Petitioner over
   the last sixteen (16) years. TT. Vol II p.173, 177, 192, 198-202,
   212.

## PHYSICAL IMPOSSIBILITY

6. Mr. Heard testified that he, Terrell Fuqua and Eric Harris were present during the argument and shooting. TT. Vol II p.161. The physical possibility of this testimony was contradicted by the testimony of Nadine Hicks and Sandra Johnson who testified that Mr. Heard was on Ms. Johnson's porch (6 or 7 houses from the scene) at the time the shots were fired. TT. Vol III p.17, 31-32. See too TT. Vol III p.13-15, 30.

7. That Mr. Heard's testimony was further contradicted by the testimony of Eric Harris who testified that he was not at the scene as stated by Mr. Heard, but rather, he was inside his house when he heard three (3) shots and then observed a car go down the street. TT. Vol III p.106. See too TT. Vol III p.131-146.

In <u>People v Lemmons</u>, supra, the Court overturned the theory of Judges sitting as the "thirteenth juror", and clearly set forth the standard or test regarding Against the Great Weight of the Evidence Motions:

> "We granted leave to appeal to address whether the trial court erred in granting defendant's motion for a new trial on the basis that the great weight of the evidence standard established in <u>People v Herbert</u>, 444 Mich 466, 476; 511 NW2d 654 (1993), permitted the trial judge to act as a "thirteenth juror." Insofar as it authorizes judges to grant new trial motions on the basis of a disagreement with juror assessment of credibility, <u>Herbert</u>, is overruled. <u>A trial judge does not sit as the thirteenth juror in ruling on motions for a new trial and may grant a new trial only if the evidence preponderates heavily against the verdict so that it would be a miscarriage of justice to allow the verdict to stand.</u>" <u>Lemmon</u>, supra at 627. (Emphasis added).

In addition, the <u>Lemmon</u> Court also discussed other State and the Federal

12

**Standards regarding said Motions:**

"Numerous federal circuits and other jurisdictions have adopted similar standards: "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction" State v Martin, 20 Ohio App 3d 172, 175; 485 NE2d 717 (1983), or "preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred * * * *" State v Kringstad, 353 NW2d 302, 306 (ND, 1984)."

In accord with these cases, the Vermont Supreme Court stated that a motion for a new trial in the interest of justice is a remedy to be used sparingly and "only in exceptional cases" and should be granted 'only upon a conclusion by the trial court that, weighing all the evidence including the credibility of the witnesses, the verdict is clearly against the weight of the evidence.'" State v LaDabouche, 146 Vt 279, 283; 502 A2d 852 (1983). The court asserted that this language permits the inference that the trial judge does not sit "merely as a thirteenth juror, but applies a stricter standard", and further noted that more recent federal cases have adopted this standard and do not mention the thirteenth juror concept.

These observations are in full accord with the language of our statute and court rule. Thus, "a new trial based upon the weight of the evidence should be granted only where the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result." LaDabouche, at 285.

We align ourselves with those appellate courts holding that, absent exceptional circumstances, issues of witness credibility are for the jury, and the trial court may not substitute its view of the credibility "for the constitutionally guaranteed jury determination thereof." Sloan, supra at 411. We reiterate the observation in Anderson v Conterio, 303 Mich 75, 79; 5 NW2d 572 (1942), that when testimony is in direct conflict and testimony supporting the verdict has been impeached, if "it cannot be said as a matter of law that the testimony thus impeached was deprived of all probative value or that the jury could not believe it" the credibility of witnesses is for the jury." Lemmon, supra, at p.641-643. (Footnotes omitted). (Emphasis added).

"Adding flesh to what is a more refined articulation of

the formula that " 'in general, conflicting
testimony or a question as to the credibility
of a witness are sufficient grounds    for
granting a new trial,'"    United States    v
Garcia, 978 F2d 746, 748 (CA 1, 1992), quoting
with approval United States v Kuzniar, 881 F2d
466, 470 (CA 7, 1989), 23  federal   circuit
courts have carved out a very narrow exception
to the rule that the trial court may not  take
the testimony away from the jury. Id.  at 470-
471. Defining the exception,    the   federal
courts have developed several tests that would
allow application of the exception; for example
if the "testimony   contradicts   indisputable
physical facts or laws," Id., "where testimony
is patently incredibile or defies   physical
realities," United States v Sanchez,   969  F2d
1409, 1414  (CA 2, 1992),  "where  a witness's
testimony is material and is  so  inherently
implausible that it could not be believed by a
reasonable juror," Garcia, supra,  at  748, or
where the witnesses testimony  has  been
seriously "impeached" and the case  marked by
"uncertainty and discrepancies." United States
v Martinez, 763 F2d 1297, 1313 (CA 11, 1985)."

Lemmon supra, p.643, & 644. (Emphasis added).


In People v McCray, 245 Mich App 631 (2001), the defendant argued for

suppression of Officer Blake's identification based upon an improper photo-

lineup, and also that the verdict was against the great weight of evidence

based on the variances in witness descriptions and that said descriptions

did not exactly fit him. In affirming the case, the Court relied upon the

Lemmon standard and reasoned as follows:

"Although there were discrepancies among witness
descriptions of the assailant and  defendant's
appearance, after review of the entire record we
conclude  that  those discrepancies do  not
preponderate so heavily against the verdict that
it would be a miscarriage of justice to let  the
verdict stand. Gadomski, supra" McCray at p.637.

Petitioner submits that the factual situation of the present case is

14

far more egregious than that of McCray, supra. First, there was only Mr. heard who identified the Petitioner as being involved in the alleged incident. And Mr. Heard's testimony was filled with problems:

1. His prior inconsistent statements to the police;

2. His admission of lying to the police;

3. His lack of recall regarding being threatened;

4. His reasons for identifying Petitioner in his second statement – to get Petitioner off the street and doing the police a favor;

5. The physical impossibility of being at the crime scene based upon the testimony of Ms. Hicks and Ms. Johnson; and

6. The fact that his testimony was also contradicted by Mr. Harris.

Petitioner submits that these factual problems far exceed those of McCray, supra, and clearly fall within most, if not all, of the Federal exceptions set forth in Lemmon, supra:

A). That his testimony contradicts the indisputable physical fact that he could not be in two (2) places at the same time;

B). That based upon the testimony of Ms. Hicks and Ms. Johnson, his testimony is patently incredible as it defies physical realities;

C). That his testimony was material (he was the only person to inculpate the Petitioner), but is inherently implausible that it could not be believed by a reasonable juror;

D). That his testimony was seriously impeached; and

E). Based upon the passage of time, the case was clearly marked by uncertainties and discrepancies – with the only consistent fact being that there were three (3) shots.

Applying the Lemmon standard to the evidence of the present case mandates the conclusion that there simply was no "believable" testimony which

15

inculpated Petitioner. Based upon this fact, the trial court, and appellate courts denial of the motion for new trial was clearly a manfest abuse of discretion, which is both review-able and reversible. Therefore, Petitioner now requests this Honorable Habeas Court to so rule, and therefore reverse his convictions.

## Standard of Review

The standard of review for a habeas petition on this claim is set forth in 28 U.S.C. § 2254(d)(2)(e)(1).

Argument

II                    THE EVIDENCE PRESENTED AT TRIAL WAS
                      INSUFFICIENT TO CONVICT THE PETITIONER
                      OF FIRST DEGREE MURDER.

Summary of Argument

Petitioner Elliott, claims that he is entitled to habeas relief because there was insufficient evidence presented at trial to convict him of the charged offense of first degree murder. In Jackson v Virginia, 443 US 307; 99 S Ct 2781; 61 L Ed 2d 560 (1979), the United States Supreme Court established that a federal court's review of a sufficiency of the evidence claim must focus on whether after viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Moreover, a Federal Habeas Corpus Court must consider not whether there was any evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of fact to find guilt beyond a reasonable doubt. In re Winship, 397 US 90 S Ct 1068; 25 L Ed 2d 368 (1970). In re Winship, presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof--defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense. Jackson v Virginia, supra, at 313-316 p.2786-2788.

Under 28 U.S.C. § 2254, a federal court must entertain a claim by a state prisoner that he or she is being held in "custody in violation of the Constitution or laws or treaties of the United States." Under the Winship decision, it is clear that a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a

17

reasonable doubt has stated a federal constitutional claim. Thus assuming that state remedies have been exhausted, see 28 U.S.C § 2254(b). Jackson v Virginia, supra, at 321, p.2790.   See too, U.S. Const Am XIV.

Facts and Argument

Following Petitioner's jury trial, he was convicted of first degree premeditated murder of Howard Smith. Petitioner argues that this conviction must be reversed because the evidence presented was insufficient to find beyond a reasonable doubt that he was guilty of first degree murder. After Winship, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. Therefore, Petitioner requests this Honorable Habeas Court to vacate this conviction.

It is fundamental to criminal law that in order to find someone guilty of a crime, that each and every element of that crime must be proven beyond a reasonable doubt:

> "A verdict of guilty in a criminal case cannot properly rest on a mere preponderance of the evidence, but should be based on proof that leaves no reasonable doubt of guilt. The people must prove every element of the crime beyond a reasonable doubt." People v Gadson, 348 Mich 307 at 310 (1957). (citation omitted).

A review to the challenge of the sufficiency of the evidence presented at trial is determined on the basis of whether, viewing the evidence in light most favorable to the prosecution, a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. People v Wolfe, 440 Mich 508 (1992); People v Hampton, 407 Mich 354 (1979).

While a trier of fact may make "reasonable inferences" from the facts of record, it may not indulge in inferences completely unsupported by the evidence, and based only upon assumption. People v Petrella, 424 Mich 221 (1985). Moreover, these inferences may not be based upon evidence that is uncertain or speculative or that raises merely a conjecture or possibility. People v Fisher, 193 Mich App 284 (1992).

The main trial evidence was presented by witness Aaron Heard, and is briefly summarized as follows:

> Aaron Heard: That after going to the movies, he, Eric Harris and Terrell Fuqua were talking in front of his house. The Appellant arrived as a passenger in a brown car and joined them. The victim was standing next-door on Eric Smith's porch, and wanted us to leave. The Appellant told him to mind his own business. That an argument ensued between the victim and Appellant. that during the argument, the Appellant produced a gun, shot the victim, and left in the brown car.

The testimony of the following witnesses are also briefly summarized as follows:

> Nadine Hicks: She was on her porch, heard three (3) shots and observed a brown or burgundy car afterwards. That Aaron Heard was on Sandy's porch at the time of the shooting.

> Sandra Johnson: On her porch with Aaron Heard when she heard three (3) shots. Ran inside, but did see a car go down the street with a person ducked down in the rear seat.

> Ray Murphy: That he left the Appellant's Sister wedding reception, with the Appellant, at about 1:00 A.M. He was driving a brown Ford Tempo or Escort. They stopped on Cherrylawn where the Appellant got out for 3-5 minutes. That he did not hear any shots because he was fiddling with the Radio. That the Appellant returned to the car, but did not enter, and he drove off.

> Officer Parshall: Took an exculpatory statement from

the Appellant on 10/15/86. Said statement is summarized as follows: At Sister wedding reception then after-party at her house. Ray Murphy gave him a ride home (13593 Cherrylawn) in a brown tempo. He spoke briefly with Terrell before going inside.

Eric Harris: That he went to the movies with Mr. Heard and Mr. Fuqua. he was inside his house when he heard three (3) shots - looked out and saw a car go past. The police threatened him and also told him what to say.

Terrell Fuqua: Has no recall of that night. Did not recognize his alleged statement to the police.

Eric Smith: Brother of victim. Arrived at scene after the shooting. Spoke with victim who said, "they got me." Saw Appellant in 2001/2002, and he said "I didn't know that was your brother", and gave me a hug.

Officer P. Kulesa: Evidence Technician, recovered spent spent bullet from door.

Doctor S. Kanluan: Reviewed records regarding file No.86-6603 Howard Smith. Cause of death was two (2) gun shot wounds to lower left back and left leg. Manner of death homicide.

From this evidence the fact finder must have been able to properly determine that the elements of the offense had been shown beyond a reasonable doubt. Those elements being:

"First-degree murder consists of the killing of a human being with malice aforethought and premeditation or deliberation, and without certain mitigating circumstances." People v Folkes, 71 Mich App 95; (1976) (citation omitted), emphasis added.

"The elements of second-degree murder are (1) that a death occurred, (2) that it was caused by the defendant, (3) that the killing was done with malice and (4) without justification or excuse."

That which distinguishes first degree murder from second degree murder

is the presence of premeditation and deliberation.

> "First-degree and second-degree murder are seperate offenses, carrying vastly different penalties, distinguishes only by the requirement that a homicide be committed with premeditated and deliberation." People v Morrin, 31 Mich App 301; 187 NW2d 434, 448-449 (1971). (Emphasis added).

The Petitioner contends that the evidence presented to the jury was "insufficient as a matter of law" to convict him of first degree murder. The first-degree murder of Mr. Howard Smith having not been properly shown, mandates that this conviction be reversed.

The vast majority of the cases dealing with the issue of the determination of premeditation all cite three main factors to be considered. Those factors were set forth in People v Gill, 43 Mich App 598 (1973):

> "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing---what may be characterized as 'planning' activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, * * * (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." Gill, supra, at 701.

In accord, see People v Sowders, 164 Mich App 36 (1987).

When these factors are applied to the present case it is clear that the evidence was insufficient, as a matter of law, to convict Petitioner of first degree murder. First, there was no evidence what-so-ever of any

"planning activity." in fact, the only testimony regarding the actual shooting was that there was an argument during which the shots were fired. There is simply no evidence to show there was "planning" upon the Petitioner's part, or that he was engaged in any "activity directed toward, and explicable as intended to result in, the killing."

Secondly, there was no testimony regarding a prior or on going relationship between the victim and Petitioner. There was no testimony of prior acrimony or hatred as a basis or motive to kill. Nor did the testimony set forth any reason for revenge.

Further, there was no evidence presented that Petitioner attempted to cover-up the crime - rather, he simply allegedly left the scene. In addition, the fact that he allegedly fled the scene is clearly not relevant of his pre-shooting mind-set - or evidence that would adequately support a finding of premeditation and deliberation. See People v Little, #217298 (citation omitted), the court stated:

> "On the other hand, there was no evidence that defendant was involved in conduct designed to cover up his actions afterwards, so as to support a finding of premeditation. See e.g., Haywood, supra at 230 (defendant's attempt to clean up blood after the killing suggests deliberation and premeditation). The prosecution argues that defendant's choice to flee the scene rather than garner aid for the victim suggests that "the homicide was the product of planning and calculation rather than 'hot blood.'" However, although such conduct may be indicative of defendant's post-homicide state of mind, it suggests little or nothing about his thoughts before or during the murder. People v Hoffmeister, 394 Mich 155, 161, n.7 229 NW2d 305 (1975). Moreover, leaving the scene of the crime is no more consistent with a premeditated attack prompted by "hot blood." Accordingly, we do not find that defendant's conduct demonstrates a lack of remorse that would support a finding of premeditation. Cf. People v Paquette, 214 Mich App 336, 342-343; 543 NW2d 342 (1995). Similarly, although the victim was stabbed numerous times, the brutality of the killing does not itself justify an inference of premeditation and deliberation. Hoffmeister, supra at 159."

In <u>People v Hoffmeister</u>, 394 Mich 155 (1975), the court discussed the required time span between the initial homicide intent and the ultimate action as set forth:

> "<u>Some time span between initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation.</u> The testimony that Hoffmeister and decedent were together for a short period of time leaves open the possibility of premeditation and deliberation. There is no basis, however, on this record for concluding that adequate time for reflection, for a "second look", intervened between formation for the homicidal intent and commission of the crime. <u>Hoffmeister</u>, supra at 161.

See also, <u>People v Griffin</u>, 108 Mich App 625 (1981), wherein the court spoke at length regarding the "time factor":

> "On the facts of Meier, the evidence of premeditation and deliberation was more compelling than is the case here. There, evidence of an argument between defendant and decedent was adduced. After decedent approached defendant the first time, it was suggested to the latter that he leave the bar where the killing occurred but he declined. <u>I have found no cases where this state's appellate courts have focused on whether there was sufficient time to premeditate and deliberate as the touchstone for determining if there was adequate evidence of premeditation and deliberation. In all the cases considering whether there was sufficient time to premeditate and deliberate, there was additional evidence tending to show actual premeditation and deliberation.</u> See e.g., <u>People v Tilley</u>, supra, <u>People v Horn</u>, 41 Mich app 755; 201 NW2d 107 (1972), <u>Iv den</u> 388 Mich 793 (1972), <u>People v Vertin</u>, 56 Mich App 669; 224 NW2d 705 (1974), <u>People v Berthiaume</u>, 59 Mich App 451; 229 NW2d 497 (1975), <u>Iv den</u> 394 Mich 788 (1975), <u>People v Livingston</u>, 63 Mich App 129; 234 NW2d 176 (1975), <u>People v Fields</u>, 64 Mich App 166; 235 NW2d 95 (1975), <u>Iv den</u> 397 Mich 861 (1976), <u>People v Jesse Smith</u>, 81 Mich App 190; 265 NW2d 77 (1978), <u>People v Clay</u>, 91 Mich App 716; 283 NW2d 870 (1970), <u>Iv den</u> 408 Mich 857 (1980), <u>Walker</u>, supra, <u>People v Moncure</u>, 94 Mich App 252; 288 NW2d 675 (1979)."

In the present case, the shots were fired during an argument between the parties, and there is no additional or other evidence upon which to determine there was deliberation and premeditation. In fact, the prosecution even conceded that the firing sequence was unknown:

> "Do we even know were the shots fired boom boom boom, were the shots fired once and then a stall or a delay and then another shot and then a stall or delay and then the third shot? We don't know." Closing Argument, TT Vol IV p.35.

Lastly, Petitioner submits that the circumstances surrounding the killing (the use of a deadly weapon and the number of the shots) do not, standing alone, point to premeditation and deliberation:

> "The brutality of a killing does not itself justify an inference of premeditation and deliberation. "The mere fact that the killing was attended by much violence or that a great many wounds were inflicted is not relevant [on the issue of premeditation and deliberation], as such a killing is just as likely (or perhaps more] likely) to have been on impulse,"
>
> There is no basis on this record for aan inference that between the successive, potential lethal blows the killer calmly, in a cool state of mind "measure[d] and evaluate[s]" and subjected 'the nature of his response to a 'second look'".
>
> "It it well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation." People v Anderson, supra, at 24.
>
> " * * * [M]any murders most brutish and bestial are committed in a consuming frenzy or heat of passion, and that these are in law only murder in the second degree murder. The Government's evidence sufficed to establish an intentional and horrible murder–the kind that could be committed in a frenzy or heat of passion. However the core responsibility of the court requires it to reflect on the sufficiently of the Government's case. * * *
>
> "The violence and multiple wounds, while more than ample to show an intent to kill, cannot standing

alone support an inference of a calmly calculated plan to kill requisite for premeditation and deliberation, as contrasted with an impulsive and senseless, albeit sustained, frenzy." Austin v United States, 127 US App DC 180, 190; 382 F2d 129, 139 (1967)." Hoffmeister, supra, at 159-160. (Footnotes omitted, Emphasis added).

"While the murder weapon was never found, it appears to have been a knife. The use of a lethal weapon is supportive of a finding of second-degree murder. But alone it is not sufficient to support a conviction of first-degree murder:

"The use of a lethal weapon is not in itself sufficient evidence to warrant a verdict of murder in the first degree but in addition to this there must be evidence in the case, as to circumstances surrounding the killing or the manner in which the weapon is used, from which a logical inference may be drawn that there was willfulness, deliberation and premeditation.'" People v Vinunzo, 212 Mich 472, 475; 180 NW 502 (1920)."

Hoffmeister, supra, at 161. (Footnote Omitted. (Emphasis added).

In accord, see People v Johnson, 427 Mich 98 (1986).

There was no evidence presented to the jury which establishes that Petitioner "premeditated" and "deliberated" the victim's death. Wolfe and Petrella, supra. But rather, the testimony clearly show that the killing was a sudden impulse which took place during the heat of an alleged argument. Based upon said lack of proof, the Petitioner argues that his first degree murder conviction must be reversed because the evidence presented at trial was insufficient to show beyond a reasonable doubt the required element of "premeditation and deliberation." Petitioner therefore requests this Honorable Court to reverse his first degree murder conviction, either immediately release him from custody or alternatively remand this matter for further

25

proceedings in the trial court.

Standard of Review

    The standard of review for a habeas petition on this claim is set forth in 28 U.S.C. § 2254(d)(1)(2);(f).

<u>Argument</u>

III       THE PROSECUTION'S CLOSING ARGUMENTS IMPROPERLY SHIFTED THE BURDEN OF PROOF, ATTACKED TRIAL COUNSEL, AND SET FORTH A PERSONAL BELIEF IN GUILT, THEREBY DENYING PETITIONER A FAIR TRIAL

<u>Summary of Argument</u>

It is well established that prosecutorial misconduct may result in a denial of a fair trial guaranteed by the due process clause. U.S. Const Am XIV; <u>Donnelly</u> <u>v</u> <u>DeChristoforo</u>, 416 US 637, 639 (1974). Failure to object to misconduct of the prosecution does not preclude appellate review, if the failure to consider the issue would result in a miscarriage of justice. See <u>Wainwright</u> <u>v</u> <u>Sykes</u>, 433 US 72 (1977).

Petitioner claims that he is entitled to habeas relief because the prosecutor committed several acts of misconduct during his closing summation to the jury. In a criminal case, a prosecutor may present evidence in a zealous manner, however, his/her zeal must remain within the proper limits and the ambit of fundamental fairness. <u>Berger</u> <u>v</u> <u>United</u> <u>States</u>, 295 US 78 (1935).

At times, a single misstep of the prosecutor may be so "egregious" as to destruct the right of a defendant to a fair trial, that reversal must follow. <u>Pharr</u> <u>v</u> <u>United</u> <u>States</u>, 48 F2d 767 (CA 6, 1931). Our United States Supreme Court reaffirmed its continuing dedication to its historical instance that prosecutors refrain from improper methods calculated to produce a wrongful conviction. <u>United</u> <u>States</u> <u>v</u> <u>Young</u>, 470 US 1 (1985); <u>Berger</u> <u>v</u> <u>United</u> <u>States</u>, supra.

The test in Michigan on matters affecting prosecutorial misconduct, is not whether there were some irregularities in the trial, but whether the defendant received a fair trial. <u>People</u> <u>v</u> <u>Foster</u>, 175 Mich App 311, 317

(1989). The Michigan Supreme Court said that the inquiry focus on whether or not a miscarriage of justice occurred in the case. People v Stanaway, 446 Mich 643, 687 (1994). It is evident in this case, a miscarriage of justice occurred, and the conviction cannot stand. US Const Am XIV.

Facts and Argument

It is the duty of the prosecutor to see that the defendant has a fair trial and to protect the interest of the people, who are as concerned with protecting the interest of the people as they are with convicting the guilty. People v Brocato, 17 Mich App 304 (1969). This right to a fair trial is guaranteed to criminal defendant's by due process: "Due Process does not require perfect trials, but it does mandate fair ones." People v Rosales, 160 Mich App 304 (1987).

The test to be applied to allegations of Prosecutorial Misconduct is that of the denial of a fair trial. "The test of prosecutorial misconduct is whether defendant was denied a fair and impartial trial." See People v Bairefoot, 117 Mich App 225 (1982)(citation omitted). See also, People v Farrar, 36 Mich App 294 (1972), wherein the court stated:

> "The prosecution should refrain from arguments which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict." Farrar, supra, at 365. (Footnote omitted).

In the present case, the prosecution argued as follows:

> "Think about this. Mr. Heard has also appeared at court proceedings here in 2002, and not only did he appear here, he appeared at an earlier preliminary hearing and he appeared at another hearing where he gave testimony under oath, where he talked about this same incident, where he talked about the facts and circumstances of same incident.
>
> Did you hear anything or anyone try and say you told some inconsistent stories in the most recent testimony. He

28

testified in March of this year. Did you hear anybody say, well, you said this in March but now you're saying something different here before you. No. He testified in April of this year. Did you hear anybody say you testified in April about the incident about what happened but you testified differently here, no. And why is that, because March - I mean, this year, 2002 Aaron Heard decided that I'm going to do it, I'm just going to tell what happened." TT. Vol IV p. 39 - 40. (Emphasis added).

"Can you as a group find a reason that's reasonable as to why I haven't proven the case? And if you feel thats the case, then the verdict should be not guilty. But I believe I've proven the case beyond a reasonable doubt." TT. Vol IV p. 44-45. (Emphasis added).

"I believe that this is a first degree murder case based on the evidence, based on what I have to prove, based on what you've heard in this case. This is a first degree murder case" TT. Vol IV p. 59 (Emphasis added).

"If you dont have the facts or the law on your side then you simply try to cause havoc. You as the attorney tries to cause havoc to the jury. You as the attorney try to sit here and just throw out all these different things as to what you should be looking at as opposed to staying focused on the facts of the case, as opposed to staying focused on what I as the prosecutor have to proof.

Now, why is that? Mr. Strong mentioned that, some of the, one of the last things he says, theres no DNA, theres no forensics therefore, lack of evidence, you should find the client not guilty.

* * * * *

The only DNA that could have been obtained that would have been helpful for this case is from Mr. Howard Smith, and how would taking his DNA help with determining if this is a murder case or not? So why even mention theres no DNA. Why even tell you as a jury theres not DNA reasonable doubt. It's to cause havoc. It's to cause you to lose focus on what you are here to do." TT. Vol IV p.100-101. (Emphasis added).

"Here's another thing, havoc. Mr. Strong was commenting on how the time of death and how I've been saying it's 12:30, no ones ever heard me say the time is 12:30. Are they in the police reports as being approximate times, yes. How do we know that this is an approximate time? Think about this. Put yourself in Aaron Heards shoes or anybody else out on that street. When a shot is being fired do you look at your watch and say it happened at 12:30?

Are you saying shots fired, 12:30, okay, it happened at 12:30 so you can later come in here and say it happened at 12:30 or are you out there talking to individuals, you hear shots, you take off. When the police talk to you, hey, I'm putting it around 12:30, 12:45 give or take. Are you focusing on the hand watch, if you even have on a watch, as to when exactly it happened, and the answer is no, and he knows that.

Here's the other thing, havoc. I showed you the elements for first degree murder. Listen to what the judge instructs you and listen to see whether I have to prove what time this happened. Listen for that. Listen to see if the judge instructs you, say Mr. Prosecutor has to prove that not only did this happen, but it had to have happened at the time that's written on the papers all throughout these files, and the answer is no, no. I have to prove that a death happened and that he did it, and that he intended to do it, so why even focus on this time? Why even throw that argument out here?" (TT. Vol IV p.102-103)

(Emphasis added).

"And keep in mind again, the last two times that he has testified, other than here, there's

been no mention that he said anything different than what happened here. There's been no mention that he said anything different than what he testified to here, and why, because he has made the decision he's going to tell the truth, and when to tell the truth, it's going to be the same. The attorneys can ask questions all day long and it's going to be the same.

(TT. Vol IV p.113).

(Emphasis added).

"Defendant is charged with first degree murder. The defense states that if there's a doubt, you should acquit him. Based on the evidence there is no doubt, or I have proven the case beyond a reasonable doubt. He shot Mr. Howard Smith in cold blood. He walked up to him, didn't like what he had to say and shot him dead right there on that porch. I'm asking you to come back with a guilty verdict for first degree murder, felony firearm. Thank you, very much."

(TT. Vol IV p.118).

(Emphasis added).

Petitioner submits that these arguments are improper and reversible error because they shift the burden of proof (should have cross-examined Mr. heard regarding his prior testimony); improperly attacked trial counsel (introducing havoc and misleading the jury); and set forth the prosecution's personal belief in guilt (I have proven the case beyond a reasonable doubt).

SHIFTING BURDEN OF PROOF

Due process entitles an accused individual to the presumption of innocence, which requires that the prosecution carries the burden of proof.

31

In Re Winship, 397 US 358; 90 S Ct 1068; 23 L Ed 2d 368 (1970). Accordingly, the prosecution may never shift the burden of proof to the defendant. People v Shannon, 88 Mich App 138 (1979):

> "It is axiomatic that defendant's failure to testify may not be commented upon by the court or prosecutor. Defendant is under no duty to take the stand or proffer evidence, but rather may remain silent protected by the presumption of innocence. This continuing presumption of innocence serves as the basis for the requirement that the state has a never shifiting burden to prove guilt beyond a reasonable doubt." Shannon, supra at 548.

The prosecution's arguments, both closing and rebuttal, clearly shifted the "burden of proof" by requiring the Petitioner to attack witness Heard by use of his testimony at prior court hearings. While the prosecutor did not specifically refer to the Petitioner or Counsel by name, the implication of the argument and that it was directed at defense counsel were made quite clear. Who other than defense counsel would attack the prosecution's main witness - and because he did not do so, the previous hearing testimony was, in fact true, and consistent with his trial testimony. This clearly placed Petitioner at a disadvantage, while at the same time was an attempt to bolster Mr. Heard's credibility with things not in evidence or of record. Prosecutor Patterson stated that: I'll give you a few reasons as to why you should believe Mr. Heard. First thing is what reason would Mr. Heard have to lie to you about what happened? * * * Mr. Heard has no reason to get up here and make up a story * * *. (TT. Vol IV p.28). Defense Counsel objected. Your Honor, I'm going to object, and my objection is, is that it's outside the scope of closing argument. It's highly prejudicial. (TT. Vol IV p.28-29).

Petitioner also cites the recent case of People v Fields, 450 Mich 94 (1995). While Fields, supra, is a missing witness case, it does address

impermissible inferences. In <u>Fields</u>, supra, the defendant was charged with Assault with intent to murder stemming from a shooting incident. Prior to trial, the Complainant (Mrs. Field's) executed an affidavit in which she recanted her previous statement to the police and then named Joanne Walker as her assailant. Mr. Fields also executed an affidavit wherein he recanted his statements to the police, also set forth Ms. Walker as the shooter, and gave his affair with Ms. Walker along with her pregnancy as reasons for his original assumption of responsibility. At trial, both Mr. and Mrs. Fields testified in accordance with their affidavits. During argument, the prosecutor argued that Ms. Walker did not exist. In resolving the matter, the Supreme Court reasoned that the argument did not shift the burden of proof, but rather only attacked the quality of the presented defense. In so reasoning, the court addressed permissible inferences and presumptions as follows:

> "The prosecutor did not argue and the jury was not instructed that it could find that Walker's testimony would have been adverse to the defense. Rather, the prosecutor's questions and comments were directed toward impeaching the defense version of the shooting by focusing the jury's attention on defendant's failure to search for Walker beyond notifying the prosecutor that she existed and asking the prosecution to locate her. <u>Arguing that a witness or evidence does not exist attacks the credibility of the theory presented. It is not a request that the jury infer that an absent witness' testimony would have been unfavorable to the defendant.</u> There is a significant difference between urging jurors to accept that the absent witness' testimony would have been adverse to the defendant "and asking them to infer from the evidence that a person whose conduct as described would have exonerated the accused from commission of the charged crime was merely a product of the defendant's imagination." <u>Alston v United States</u>, 552 A.2d 526, 528 (DC App, 1989). <u>Where the prosecutor's argument does not invite the jury to infer that the absent witness' testimony would be</u>

unfavorable, the missing witness cases are inapposite. <u>United States</u> v <u>Martin</u>, 696 F.2d 49 (CA 6, 1983)."

<u>Fields</u>, supra, at 106. (Emphasis added).

"Nor is such comment violative of due process under another form of the burden shifting argument, which traces its lineage to the constitution's preclusion of a presumption on an element of the offense  that shifts the burden of disproving that element to the defense. <u>In Re Winship</u>, 397 US 358; 90  S. Ct 1068; 25 L Ed 2d 368 (1970). <u>A  permissive  presumption allows, but does not require, the jury  to  find proof of a basic fact, and "affects the application of the 'beyond a reasonable doubt' standard only if under the facts of the case, there is no  rational way the trier could make the connection  permitted by the inference."</u> <u>Ulster Co Court</u> v <u>Allen</u>, 442 US 140, 157; 99 S Ct 2213; 60 L. Ed 2d 777 (1979). Instructions on mandatory presumptions may  shift the burden  of    production or persuasion, and shifting the burden of proof or persuasion on  an element of the crime charged violates due process. <u>Ulster Co</u> v <u>Allen</u>, supra; <u>Sandstorm</u> v <u>Montana, 442 US 510</u>; 99 S Ct 2450; 61 L Ed 2d 39 (1979); <u>Francis</u> v <u>Franklin</u>, 471 US 307; 105 S Ct 1965; 85 L. Ed  2d 344 (1985)."

<u>Fields</u>, supra, at 112-113.

(Emphasis added).

Clearly, by arguing counsels failure to attack Mr. Heard with his testimony at previous court hearings, the prosecution was asking the jury to infer that said prior testimony was both true and consistent with his trial testimony. And while Mr. Heard was not a "missing witness" the inference is the same - that his prior hearing testimony would have been unfavorable to Petitioner.

In <u>People</u> v <u>Rosales</u>, supra, the defendant testified he was unable to recall his whereabouts based upon the lapse of eighteen (18) months between the incident and his arrest. During rebuttal argument, the prosecution argued

34

as follows  <u>Rosales</u>, supra, at 143:

> "Finally, I would indicate that the defendant has
> testified that he doesn't recall where he was on
> the date in question but obviously he was
> somewhere other than the Little Red Store. And I
> would question the defendant' failure to present
> any corroborating testimony to that effect of his
> whereabouts and doings on the date in question."

Despite the fact that this was a "waiver trial", a panel of the court

of appeals held the prosecution's argument to be burden shifting and improper:

> "A fundamental pillar of our legal system is that a
> person is presumed innocent until proven guilty.
> Accordingly, the prosecution may never shift its
> burden to prove that defendant is guilty beyond a
> reasonable doubt and obligate the defendant to prove
> his innocence.
>
> 'It is the duty of the prosecution to show beyond a
> reasonable doubt that the defendant did commit the
> crime and that, therefore, the defendant was at the
> scene of the crime at the time it was committed.'
>
> By pointing out defendant's failure to present
> corroborating testimony, the prosecution created a
> serious error because it attempted to shift the
> burden of proof onto defendant to prove he was not
> at the robbery site."

> <u>Rosales</u>, supra at 143. (Emphasis added).

Even though <u>Rosales</u>, supra is pre <u>Fields</u> supra, the Petitioner believes

the basic theory of the case is still applicable – that the prosecution can

not argue testimony must be true based upon the failure to cross-examine

the witness.

In <u>People</u> v <u>Foster</u>, 175 Mich app 311 (1989), the defendant and his wife

testified regarding threats made by the Complainant as well as police reports

made thereon. During argument, the prosecution called for corroborating

evidence regarding the police reports. In reversing the conviction, the court

reasoned as follows:

> "We do not believe that defendant received a fair
> trial. Due process entitles an accused to the

35

> presumption of innocence, while the prosecution
> carries the burden of proving guilt beyond a
> reasonable doubt. The prosecution may not suggest
> in closing argument that defendant must
> prove something or present a reasonable explanation
> for damaging evidence as this argument tends to
> shift the burden of proof."

Foster, supra, at 398. (citation omitted).

The Petitioner submits that Foster, supra is applicable to the present case because, as in Foster, supra, the prosecutor's argument called for an explanation of Mr. Heard's testimony at the other court hearings.

In People v Guenther, 188 Mich App 174 (1991), the court of appeals drew a fine line between shifting the burden of proof and disparagement of the defense presented:

> "Although a prosecutor may not suggest in closing
> argument that a defendant must prove something
> because such an argument tends to shift the burden
> of proof, the prosecutor here did not make a
> comment which shifted the burden of proof. Read in
> context, the prosecutor's remark that 'the defense
> should have removed any doubt' was a disparagement
> of the defense presented - no opportunity -base on
> the evidence. In other words, the prosecutor was
> arguing that the defense presented in fact
> strengthened the prosecution's case. Nothing
> precludes a prosecutor from the evidence presented
> to discredit a defense."

Guenther, supra, at 63. (citation omitted).

The Petitioner submits that Guenther supra is also applicable to the present case for the following reasons: (1) the prosecutor was arguing that Petitioner should have attacked and had to "disprove" Mr. Heard's previous hearing testimony; and (2) the argument was based upon un-introduced evidence - Mr. Heard's testimony during other court proceedings.

Because the prosecution's arguments improperly shifted the burden of proof, they were improper arguments and are reversible. Based upon these errors and the resulting denial of a "fair trial", Petitioner requests that